## WILLIAM A. BORDEN *vs.* THE TOWN OF WESTPORT ET AL.

Third Judicial District, Bridgeport, April Term, 1926.

WHEELER, C. J., CURTIS, MALTBIE, HAINES and HINMAN, Js.

Declarations as to the location of ancient boundaries are hearsay and are not admissible in evidence unless it appears: (1) that the declarant is dead, (2) that he would be qualified as a witness to testify if present and especially that he had peculiar means of knowing the boundary, (3) that the statement was made before the controversy in suit arose, and (4) that he had no interest to misrepresent the truth in making the declaration.

In the present action to quiet title, one of the defendant's witnesses was permitted to repeat what had been declared to him concerning the disputed western boundary of the property by his

deceased father who had previously conveyed to a grantee in the plaintiff's chain of title a half interest therein by warranty deed; and the trial court in rendering judgment for the defendant, established the western boundary in exact accordance with this declaration—a conclusion which could not reasonably have been drawn from any other evidence in the case. It appeared that if the bound were located as claimed by the plaintiff, the area of the land would be 2.47 acres, whereas the statement of the deceased restricted the quantity to 1.34 acres. *Held* that the admission of the declaration was erroneous, since so far from indicating a lack of interest on the part of the declarant to misrepresent the truth, it obviously was self-serving in character in that it tended to limit his obligation under his covenants of warranty by diminishing the acreage of land covered by his deed; and that the judgment as rendered, being supported by no other evidence, must be reversed.

Argued April 16th—decided October 18th, 1926.

ACTION to quiet and settle the plaintiff's title to a certain tract of land in the town of Westport, brought to the Superior Court in Fairfield County and tried to the court, *Nickerson, J.;* judgment rendered for the plaintiff as to a part only of said tract, from which he appealed. *Error and new trial ordered.*

*Warren F. Cressy,* for the appellant (plaintiff).

*Raymond E. Baldwin,* for the appellees (defendants).

HAINES, J. The plaintiff claims title in fee to certain real estate on the shore of Long Island Sound at Compo Beach, so-called, in what is now the town of Westport, and doubt being raised as to the extent of his ownership, he brought this action to quiet title. Upon the application of the Attorney General, the State of Connecticut was made a party defendant with the town of Westport, and in their respective answers, the defendants each claim ownership of the land in dispute, and deny that the plaintiff has title.

The land in question is part of a larger tract which lies between Compo Pond, so-called, and Long Island Sound. The western boundary of this larger tract is a public highway known as the Hills Point Road, running nearly north from Long Island Sound past the large tract and past the west end of Compo Pond.

On the east, this large tract is bounded by water, being a portion of the pond and a projection or inlet of Long Island Sound and channels or streams which form the outlet and inlet of Compo Pond. The pond is at such a level that it is open to the ebb and flow of the tide through these channels or inlets, and this furnishes a potential water power, which was early recognized by the inhabitants of Fairfield.

On April 17th, 1705, the following vote was passed in a town meeting of the town of Fairfield: "Tho' Ockley of Westchester is desirous & proposeth to erect a grist mill or grist mills upon Compo Creek within ye bounds of Fairfield. The Town do by vote grant liberty unto ye sd. Tho' Ockley to erect a grist mill or grist mills as aboved upon ye sd. Compo Creek upon conditions yt. he do att all Times indemnifie ye proprietors of ye meadow lying on sd. Compo Creek & also on ye Creek Eastward of Gallups gap wth. reference unto wt. damage shall acrue to ye sd. meadow by virtue or reason of his erecting sd. mill or mills on sd. Compo Creek also on conditions yt. he sd. Ockley do accomplish ye building sd. mill or mills wth. in two years next after this date. Also he agreeing to such articles with ye following Committee wth. reference to ye whole of ye affair of ye mill or mills as to situation & Terms of Grinding as to Tole & everything else proper in ye premises with ye following Committee. Also ye Town do grant until him sd. Ockley one parcel of land att ye narrow of Compo Creek on ye west side to be unto him & his heirs so long as he or they shall

maintain a sufficient grist mill or mills on sd. Creek, such piece and quantity as ye following Committee shall lay out unto him not exceeding half an acre. The Town do appoint & Impower Mr. Peter Burr, Sergt. Jos. Lockwood & Sanll. Couch as a Committee to have full power to treat wth. sd. Ockley about ye premises for all things."

The following day, April 18th, 1705, this committee entered into the following agreement: "Whereas the Town of Fairfield have granted liberty to Thomas Oakley of Westchester to erect a Grist Mill or mills upon Compow Creek within ye bounds of Fairfield upon Compow conditions mentioned in said Grant one whereof is he agreeing to such artickles with reference to said mill or mills as to situation and tolle and everything else proper to the premises, with us Peter Burr, Joseph Lockwood and Samuel Couch as A Committee appointed by the said Town for ye affair as may more full appear by the records of said Town bearing date April 17, 1705. Now know all men yt ye said Thomas Oakley hath agreed with us the above said committee and do hereby covenant, promise and bind himself and his suckessors in ye said mill or mills to secure all such grain as shall be brought to ye said mill or mills by any inhabitant or inhabitants of the said Town of Fairfield at all times and grind the same seasonably before he or they shall grind for a stranger; into good sufficient meal taking only a suitable part for tole and also to keep ye said mill or mills continually in good repairs after ye time mentioned in ye said grant for accomplishing the same or if ye said mill be at any time out of repair he or they shall as commonly may be repair the same againe or in case he or they faile thereof the said mill or mills or wt shall remain of ye same and ye dam and all other appurtenances of ye said mill or mills to be at ye command and cost of ye

said Town of Fairfield provided they will pay to him ye said Ockly or his suckessors in the said mill or mills the value thereof and it is to be understood that the stream is not to be accounted and appurtenance of the mill but in case of the failure above mentioned the stream to be free at ye said townes command. In confirmation whereof the said Thomas Oakly hath hereunto set his hand this 18 day of April, Anno dom; 1705.

Witnesses                         Thomas Ockly."
Joseph Lockwood
Peter Burr
Samuel Couch."

This appears to have been the first individual transfer of any part of the large tract. The former bounds of the town of Fairfield and the Parish of Green's Farms included this entire property. The proprietors of the town of Fairfield acquired title from the Indians in 1680. They also obtained a patent from the General Court on May 26th, 1685, and the General Court confirmed this patent in May, 1703. In 1855 Westport became a town, and this tract was included within its limits. By Special Act of the Legislature in 1907, a transfer was made to the town of Westport, of all undivided lands which originally belonged to the ancient proprietors of the town of Fairfield.

It appears that the mill was built by Oakley and put into operation. From that time to 1793 there were various conveyances of this mill property, but none of them mention the amount of land included within the site. In that year George Cable, who then owned the property, conveyed it to one Scribner, by the following description: "My grist mill near the above described premises with about an acre of land adjoining, bounded westerly by the highway and on all other

parts by creek and beach together with all the streams and dams and other appurtenances belonging to said mill."

Substantially the same description is used in the various conveyances which follow the above. On May 14th, 1855, this mill property was conveyed by the then owners, Henry B. Sherwood and Daniel Sherwood, to the Stamford Manufacturing Company, the description being as follows: "All that certain piece or parcel of land in extent about one acre be the same more or less situated in Westport in said State and bounded Northerly by the Mill Pond, so-called, East by Long Island Sound and West by land lately owned by Abraham Sherwood, Francis Sherwood and Franklin Sherwood and by the said beach, with the Mill, Dams, Breakwater, Wharves and Water privileges attached thereto and situated thereon, being the same premises two undivided third parts of which were conveyed to the said parties hereto of the first part by Abraham Sherwood, Franklin and Francis Sherwood by deed dated the fourth day of March 1853 and recorded in the office of the Town Clerk of Westport in Vol. 6 Page 261 with the appurtenances and all the estate, title and interest of the said parties of the first part herein."

The property came thence by mesné conveyances to Franklin Wayland Fellowes, and on March 25th, 1901, by a deed of the administratrix of his estate, Margaret M. Fellowes, it was conveyed to the plaintiff by the following description: "A certain piece or parcel of land with the buildings thereon, situated in the town of Westport, Fairfield County, State of Connecticut, in extent one acre, be the same more or less, and bounded Northerly by the Mill Pond, so-called, East by Long Island Sound and the beach thereof, South by said Long Island Sound, and West by land now or

late of Abraham Sherwood, Francis Sherwood and Franklin Sherwood and by the said beach, with the mills, dams, breakwater, wharves and water privileges attached thereto, and situated thereon. Being the same premises conveyed to The Stamford Manufacturing Company by Daniel Sherwood and Henry B. Sherwood by a deed dated May 14th, 1855, and recorded in the public land records of the said Westport, in Book 7, on page 721, and by said The Stamford Manufacturing Company conveyed to the aforesaid Frank Wayland Fellowes by a deed dated July 20th, 1885, and recorded in the public land records of said Westport in Book 17, page 139."

From time immemorial there has been and still is a roadway, described in some of the early conveyances as a "drift-way, right-of-way or lane," running eastward from the Hills Point Road, at some distance south of the south shore of Compo Pond, to the mill building in question. A branch of this driftway or road begins at a point thereon, some little distance from the mill, and extends northeasterly to and across the end of the pond where the water is shallow. These roadways have been used by the public generally for a great number of years, for purposes of general travel.

That part of the large tract first referred to, which lies on the south shore of Compo Pond, east of the Hills Point Road, and bounded on the south by this driftway or road, was, many years ago, enclosed in part by stone walls, and one wall on the eastern boundary of this tract, extends southerly to or near the point where the branch driftway or road meets the main driftway or road to which reference is made above. The land west of this branch driftway or road, is now owned by various parties and several houses and other buildings stand thereon, most of them facing across this road, the open beach and Long Island Sound. It

is conceded that this occupied tract is not involved in plaintiff's claim in this action.

The western end of that portion of the tract which lies south of the driftway or road contains another piece of land which was long ago enclosed in whole or in part by a wall. This is known as the Bumpus tract, and is not claimed by the plaintiff. All of the rest of the large tract which lies south of the driftway or road, is claimed by the plaintiff to be included within the description in his deed from the administratrix of the estate of Franklin Wayland Fellowes above referred to. This results from the interpretation which he puts upon the description in the deed, of the western boundary line of the property conveyed to him. The defendants, on the other hand, contend that the description in the deed puts the western boundary of the plaintiff's land much further east, and the trial court in upholding the defendants' claim fixed the line as the branch roadway referred to, and a line extended southerly to a point in the stream or inlet which was determined from the testimony. The land in dispute is the open sandy beach front which lies between the houses and driftway or road on the north and the sea on the south. This, the defendants say, has been used from time immemorial by the public and has always been and still is common and undivided land. It will be seen from the facts recited that this dispute can only be settled by a conclusive determination of the true western bound of the land which was conveyed to the plaintiff by the Fellowes deed. The trial court correctly decided that this was the determinative feature of the case, as appears from the memorandum of decision.

One of the numerous reasons of appeal is based upon the admission of testimony by the trial court, upon this exact point. One Henry B. Sherwood was a

grantor in a warranty deed in the plaintiff's chain of title. As part owner of the mill property, so-called, he sold his interest, in 1855, to the Stamford Manufacturing Company. At the time of the trial of this action Henry B. Sherwood was dead, but his son, Rollin G. Sherwood, was permitted, over the plaintiff's objection, to testify that his father had told him that the western boundary line of the property was the line above described and embodied in the conclusion of the trial court. It was admitted that this conversation between father and son, took place after the father had given the warranty deed, so he was not then an owner of the property. The importance of his testimony becomes apparent upon a study of the evidence given in the case, which is all before us. It is true, that there is evidence which may be said to point to the substantial correctness of the conclusion which the court reached, but it is obvious that the court based its conclusion as to the specific location of the line upon the statement of this deceased former owner of the property.

The statement was clearly hearsay; but the defendants claim it came within recognized exceptions to the admission of such testimony.

One of these exceptions is the statement of an owner in possession against his own title or interest. In a suit to which such owner is not a party, evidence of such statement made by him, may be given. Such a statement is deemed to have a certain guaranty of trustworthiness if made against the interest of the owner. It is recognized that one will not be likely to make a statement against his own interest unless it be true. Similar statements in his own interest would not carry that sanction, being self-serving declarations only, and so not admissible. *Smith* v. *Martin,* 17 Conn. 399, 401.

In the case at bar, the statement was made by one who, at the time he made it, had parted with his title and possession, and his interest in the bound then lay in the fact that he had given a warranty deed of the property. Under the claim of the plaintiff in this action, the warranty would have required Sherwood to warrant 2.47 acres in the tract conveyed, while this statement as to the western bound, if true, would have restricted his obligation under the warranty, to 1.34 acres. Not only was the author of the statement deceased, and out of possession at the time, and without title, but his was an obviously self-serving declaration, one which was in his own interest.

It is often urged that all evidence by ancient owners should be admitted out of the necessities of the case where boundaries have become obscure in the lapse of time, if the statement is by one who had peculiar means of knowing the truth. But necessity alone does not furnish a sufficient sanction for the exception to the rule which excludes hearsay testimony. The court must see that in the circumstances, it carries certain assurances of being of a trustworthy character, and may be relied upon.

Under our rules of procedure we require the sanction of the oath of a witness, and his testimony is submitted to the test of cross-examination. Both these requirements are nullified by the admission of hearsay testimony. But the necessities of the case, such as the absence of any other sufficient proof, often does result in the offer of hearsay evidence, particularly in the case of ancient boundaries, and in these circumstances it can be admitted in aid of the ascertainment of the truth, provided the court can find in it some other sanction and test which is the equivalent of that which is to be dispensed with. *South-West School District* v. *Williams,* 48 Conn. 504, 507.

The attempt to do this has led to much confusion of reasoning and there are now many differing decisions in the various jurisdictions of this country. In this State, however, the question has been carefully considered, the principles involved have been fully discussed, and the rule may be said to be settled. This rule requires, as stated in our leading case, that four prerequisites must be shown to exist, to permit the introduction of this class of evidence, viz.: (1) that it must be the declaration of the dead; (2) that it must appear that the declarant would have been qualified as a witness to testify if present, and especially that he had peculiar means of knowing the boundary; (3) that the statement was made before the controversy, in the trial of which the declaration is offered, had arisen; (4) that the declarant had no interest to misrepresent in making the declaration. *Turgeon* v. *Woodward,* 83 Conn. 537, 541, 542, 78 Atl. 577. The statement of the rule which we adopted in that case, has not since been modified or changed in this State. An examination of the text-books and the decisions of the courts in other jurisdictions shows a strong tendency to support this statement upon a subject concerning which much confusion has existed. We cited the following as then supporting our position: *Yow* v. *Hamilton,* 136 N. C. 357, 358, 48 S. E. 782; *Sasser* v. *Herring,* 3 Dev. (N. C.) 340; *Table Rock Lumber Co.* v. *Branch,* 150 N. C. 240, 241, 63 S. E. 948; *Peters* v. *Tilgham,* 111 Md. 227, 235, 73 Atl. 726; *Child* v. *Kingsbury,* 46 Vt. 47, 54; 2 Wigmore on Evidence, § 1566; 1 Greenleaf on Evidence (16th Ed.) § 140*a*; Jones on Evidence (2d Ed.) § 309.

Testing the question before us then, by the rule above stated, there can be no question but that the first three requirements were fully met; the declarant was dead, he would have been a competent witness,

with means of knowledge as to the location of the boundary in question, and his declaration was made long before this controversy arose. The admissibility of the declaration then, depended upon the fourth requisite, viz., did Henry B. Sherwood have any incentive to misrepresent, when he stated the location of the boundary line? It will be seen that the question is not whether he did misrepresent, but whether he had any incentive to do so. The record discloses that at the time he made the declaration he had parted with his title and was no longer the owner of the property. He had, however, given a warranty deed and was therefore obligated to see that his successors in title obtained the full amount of land which his deed called for. His declaration limited the land to 1.34 acres, by fixing the western boundary where it did. If the western boundary was to be fixed where the plaintiff contends it should be, the warranty would have covered 2.47 acres. It is manifest that here he was limiting his liability by 1.13 acres. The declaration, therefore, was not against his interest, but was strictly a self-serving one. It was to his interest to have the boundary fixed as he stated it should be. The statement obviously fails to meet the fourth requisite for its admission, and we are compelled to hold that it was error to admit it. We have dealt somewhat fully with the facts of this case and with the principles governing the admission of this testimony, because of the peculiar importance which this declaration assumed at the trial. The statement was vital in the decision of the case. The record does not disclose any other evidence sufficient in itself to support the trial court's conclusion that this was the true western boundary line of the plaintiff's land. The fixing of this line by the trial court determined the judgment for the defendants and against the plaintiff, and under these

circumstances the admission of the declaration was reversible error. It is unnecessary to discuss other reasons of appeal, since none of them would affect this result.

There is error and a new trial is ordered.

In this opinion the other judges concurred.